550 F.2d 435
 1 Fed. R. Evid. Serv. 492
 UNITED STATES of America, Plaintiff-Appellee,
v.
Scott WOOD, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jose BELTRAN-LEON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
George L. MARTINEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jose VELASQUEZ-LEDESMA, Defendant-Appellant.
 Nos. 76-1538, 76-1482, 76-1425 and 76-1350.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 23, 1976.
As Amended on Denial of Rehearing and Rehearing En Banc March 1, 1977.
 
 Paul J. Fisher, Seattle, Wash., for Scott Wood.
 Philip A. DeMassa (argued), San Diego, Cal., for Jose Beltran-Leon.
 James M. McCabe, appointed (argued), San Diego, Cal., for George L. Martinez.
 Thomas M. Geisness (argued), of Geisness & Day, Seattle, Wash., for Jose Velasquez-Ledesma.
 J. Ronald Sim, Asst. U. S. Atty. (argued), Stan Pitkin, U. S. Atty., Seattle, Wash., for the United States.
 Appeal from the United States District Court for the Western District of Washington.
 Before ELY, CARTER, and GOODWIN, Circuit Judges.
 JAMES M. CARTER, Circuit Judge:
 
 
 1
 This is a consolidated appeal by four defendants convicted by a jury of various counts involving the importation, possession, and distribution of nine tons of marijuana. Appellants claim numerous errors by the trial court. We dismiss the appeal of one appellant and affirm the convictions of the others.
 
 Facts
 
 2
 On October 22, 1975, Drug Enforcement Administration (DEA) agents arrested Hector Lazos and George Martinez, both citizens of Mexico, in Seattle. Lazos soon began to reveal the details of a shipment of nine tons of marijuana smuggled from Mexico to Seattle on a fishing boat. Based on this information, a search warrant was obtained and a search conducted of a ranch located near Black Diamond, Washington, where about four and one-half tons of marijuana were found.
 
 
 3
 Under the direction of DEA officials, Lazos cooperated by making telephone calls to several of the other defendants to arrange sales of the marijuana. These conversations were taped and played at trial. Lazos called appellant Jose Velasquez-Ledesma in San Francisco. Velasquez was staying in a hotel with appellant Jose Beltran-Leon. An arrangement was made for Velasquez and Beltran to come to Seattle to pick up the money from the sales.
 
 
 4
 Lazos and appellant Scott Wood picked up Velasquez and Beltran at the airport in Seattle and drove back to a hotel. A tape was made of the conversation during this trip, although the quality of the recording was quite poor. A copy was later made available to the defendants. During the conversation, a sale was planned involving two DEA agents posing as customers.
 
 
 5
 Velasquez and Beltran checked into their hotel. Lazos and Wood went to an isolated house where more marijuana was stored and made the "sale" to DEA agents. Velasquez, Beltran, and Wood were then arrested. A subsequent search of the boat used for the job revealed traces of marijuana and maps and charts indicating a route from Mexico prepared by Wood, who operated the boat.
 
 
 6
 Lazos testified at trial that the criminal scheme began in September 1975. He met with Velasquez, Martinez, and Beltran's brother-in-law, "Noe," in Los Angeles to plan the operation. Velasquez told Lazos that the marijuana was owned by Roberto Beltran, Beltran's uncle, that Wood would supervise transportation, that Martinez would buy the load, and that Beltran would be picking up the money from the sale. This testimony constituted the principal part of the government's case.
 
 
 7
 Appellants were charged along with 10 other defendants in a 10-count indictment. After a two and one-half week trial, all of the appellants were convicted of some counts and acquitted of others. Two defendants were acquitted of all counts. Wood and Velasquez received 10-year sentences; Beltran got six years; Martinez received four. Velasquez and Martinez are serving their sentences. Beltran is free on bail. Wood is a fugitive.
 
 Dismissal of Wood's Appeal
 
 8
 Appellant Wood is currently a fugitive from justice. The trial court has issued a bench warrant for his arrest for failure to comply with the conditions of his bail. His attorney was advised that his appeal was in jeopardy unless he surrendered himself. He has not. There is no indication that he would do so upon a decision adverse to him. Dismissal of an appeal of a fugitive under these circumstances is appropriate. See Molinaro v. New Jersey, 396 U.S. 365, 366, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970); United States v. Villegas-Codallos, 543 F.2d 1124 (9 Cir. 1976); Johnson v. Laird, 432 F.2d 77, 79 (9 Cir. 1970). Wood's appeal is therefore dismissed.
 
 Probable Cause to Search
 
 9
 Following the arrests of Lazos and Martinez, the government procured two search warrants. The first authorized the search of the ranch near Black Diamond, Washington, where the marijuana was found. This warrant was based upon the affidavit of a DEA agent who received his information from Lazos. The second warrant was issued for the search of the vessel used in the smuggling operation.[1]
 
 
 10
 Appellants argue that the search warrant issued for the search of the ranch failed to meet the two-pronged test of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Under Aguilar, a warrant must be based on an affidavit which informs the magistrate of (1) some of the underlying circumstances from which the informant's information is drawn, and (2) some basis for determining that the informant is credible. 378 U.S. at 114, 84 S.Ct. 1509. See also United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).
 
 
 11
 The affidavit in this case detailed the DEA's knowledge of the Beltran drug-smuggling organization. It contained a detailed description of the residence where the marijuana was stashed, as well as the identity of at least one of the occupants. This information alone meets the first prong of the Aguilar test.
 
 
 12
 But the informant also disclosed his personal role in the smuggling operation. He admitted participation in illegal activities. Such statements against one's own penal interest are a sufficient indication of reliability by themselves. As the Chief Justice said for the plurality in Harris :
 
 
 13
 "Quite apart from the affiant's own knowledge of respondent's activities, there was an additional reason for crediting the informant's tip. Here the warrant's affidavit recited extrajudicial statements of a declarant . . . that over the past two years he had many times and recently purchased 'illicit whiskey.' These statements were against the informant's penal interest. . . .
 
 
 14
 "Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements. People to not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility sufficient at least to support a finding of probable cause to search." 403 U.S. at 583, 91 S.Ct. at 2082.
 
 
 15
 We believe this reasoning is compelling here. The informant's admissions, coupled with his specific information, combine to form more than an adequate basis of reliability of the affidavit. Thus, the second prong of the Aguilar test is met and probable cause is established for the warrant. See also United States v. Carmichael, 489 F.2d 983 (7 Cir. 1973) (unsworn statements of secondary informant establish probable cause).
 
 Beltran's Motion for Severance
 
 16
 On the morning of the trial, counsel for Beltran represented to the court that if he were granted severance, both Wood and Velasquez would testify on behalf of his client. No affidavits were presented nor was additional proof that this testimony would be forthcoming offered despite the opportunity given for this purpose by the district court. However, counsel for both Wood and Velasquez were present during this discussion and neither objected to counsel's representations.
 
 
 17
 A motion for severance under Fed.R.Crim.P. 14 is committed to the sound discretion of the trial court and will not be disturbed on appeal absent a showing of abuse. United States v. Olson, 504 F.2d 1222, 1224 (9 Cir. 1974). Beltran failed to demonstrate that co-defendants Wood and Velasquez actually would testify at a severed trial. There was no offer of proof as to what testimony, if any, they would give. Under these circumstances there was no abuse of discretion by the district court. Cf. United States v. Cruz, 536 F.2d 1264, 1268 (9 Cir. 1976); United States v. Ellsworth, 481 F.2d 864 (9 Cir. 1973).
 
 Post-Arrest Activity of Informant Lazos
 
 18
 After his arrest, Lazos began assisting the DEA in gathering evidence against his co-conspirators. He made telephone calls, recorded with his consent, to several of the defendants as well as to the wife of Velasquez. Velasquez argues that these calls indirectly interfered with the attorney-client privilege. He admits that there are no cases holding that post-arrest contact by the government with a defendant's wife is a basis for reversal.
 
 
 19
 There was not the type of interference here as seen in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), where the government directly invaded the defense camp to obtain information about trial strategy. However, we are inclined to agree with appellant that the government acted improperly in arranging these calls. Any delay caused by or lack of trust resulting from these contacts could be a violation of a defendant's right to counsel and require reversal. But Velasquez has failed to show that any of the informant's calls to his wife prejudiced him in any way.
 
 
 20
 Absent such a showing, the argument must fail. This is not a case such as Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), where post-arrest conversations were used as evidence against the defendant. The government here did not offer evidence of any of the post-arrest conversations at the trial. Velasquez does not claim that other evidence may
 
 
 21
 be a fruit of this activity. Accordingly, there was no
 
 
 22
 reversible error. The District Court's Refusal to
 
 
 23
 Hold a Hearing on the Legality of Martinez' Arrest
 
 
 24
 Martinez argued before trial that his Miranda warnings were inadequate. The court ruled that the question would be reserved for determination during trial when the officer who arrested Martinez testified. As the trial went on, the government announced that it would not attempt to introduce any of Martinez' post-arrest statements, thus obviating the need for any Miranda hearing. Counsel for Martinez made no objection to this procedure at that time.
 
 
 25
 During the trial, counsel argued for the first time that certain exhibits were the product of an unlawful seizure. He moved to suppress four exhibits (out of over 100 presented). This motion was untimely under Fed.R.Crim.P. 12(b)(3), which requires motions to suppress to be made before trial. The trial court refused to hold a hearing on the motion.
 
 
 26
 There was no excuse for not making a timely motion. Counsel represented appellant at the preliminary hearing at which time it became known that the arrest was made without a warrant. And even if the claim of surprise on that date is accepted, counsel was inexcusably dilatory in not making the motion until four days after receipt of the government's evidence list. See United States v. Barclift, 514 F.2d 1073 (9 Cir. 1975) (three-day delay found inexcusable). Thus, the court acted within its discretion in denying the motion.
 
 
 27
 But even assuming, arguendo, that the court abused its discretion, appellant would have to show substantial prejudice in light of this failure to make a timely motion. He does not. The post-arrest statements of Martinez were not used. The government's case was based on evidence untainted by any questionable arrest or seizure. Martinez does not show where or how he was prejudiced. No reversible error could have occurred.
 
 Restrictions on Cross-Examination
 
 28
 Appellants Beltran and Velasquez contend that the trial court unduly restricted cross-examination of Lazos. Both sought to impeach the credibility of Lazos by references to past narcotics dealings, outstanding warrants in other places, and possible "deals" with the DEA. Appellants are correct in asserting that because Lazos was the government's crucial witness and an informant, wide latitude was required on cross-examination. See Gordon v. United States, 344 U.S. 414, 417, 73 S.Ct. 369, 97 L.Ed. 447 (1953); United States v. Marshall, 526 F.2d 1349, 1361 (9 Cir. 1975).
 
 
 29
 This does not mean that the scope of cross-examination is unlimited. The scope of examination is a matter of discretion for the trial court. United States v. Haili, 443 F.2d 1295, 1299 (9 Cir. 1971). An examination of the record in this case suggests that a wide-ranging cross-examination was conducted by six attorneys with over 300 pages of transcript. Lazos was questioned about his use and distribution of drugs, his experience with firearms, and his past confrontations with the law. The district court allowed greater cross-examination than is required.
 
 
 30
 The decisions of this court support this conclusion. In United States v. Carrion, 463 F.2d 704 (9 Cir. 1972), an accomplice testified concerning a conspiracy to import marijuana from Mexico. The court rejected appellant's contention that the trial court improperly restricted his right of cross-examination. The court stated:
 
 
 31
 "The trial judge acted within the scope of his discretion in limiting cross-examination. While the questioning was undoubtedly designed to impeach the witness, the transcript reveals that appellant's counsel began to range too far afield of issues to be determined by the jury. One duty of the trial court is to limit cross-examination at that point to prevent defense counsel from confusing the jury with a proliferation of details on collateral matters." 463 F.2d at 707.
 
 
 32
 See also United States v. Marshall, supra, at 1361; Enciso v. United States, 370 F.2d 749, 751 (9 Cir. 1967).
 
 
 33
 Beltran claims he was improperly denied discovery of notes of interviews with Lazos taken by the United States Attorney. This court in United States v. Harris, 543 F.2d 1247 (9 Cir., 1976), held that rough interview notes are discoverable. However, this rule was given prospective effect only, and the court there determined whether failure to produce the notes in that case resulted in prejudice. United States v. Parker, 549 F.2d 1217 (9 Cir. 1977). See also United States v. Robinson, et al., 546 F.2d 309 (9 Cir. 1976).
 
 
 34
 Here appellant sought interview notes of Lazos. But appellant's conviction rests on more evidence than the testimony of Lazos. As indicated in the discussion of sufficiency of evidence, infra, there was ample evidence other than this testimony connecting Beltran with the conspiracy. Therefore, non-production of these notes would at most be harmless error.
 
 
 35
 However, the only evidence in the record indicates that these materials did not relate to the subject matter of direct examination, and therefore did not fall within the purview of the Jencks Act. This conclusion is supported by an in camera inspection by the court of certain materials sought by the defense. Goldberg v. United States, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976), does not compel discovery here because the notes involved in that case were written in part by the witness himself and related to the subject matter of the direct examination.
 
 Evidentiary Rulings
 
 36
 Beltran argues that he was denied due process by the court's refusal to permit the introduction of certain evidence. He sought to introduce the full tapes of telephone conversations between Lazos and Velasquez' wife to show the bias of Lazos against him. It is clear that Lazos had only contempt for Beltran. However, a reading of Lazos' comments suggests that his "revenge" took the form of telling the truth about Beltran's role. Moreover, counsel was permitted to use the transcript of the tape during cross-examination, so that its contents were revealed to the jury anyway. Although the full transcript probably should have been admitted, its insignificant addition to Beltran's case falls short of requiring reversal. "Irreparable prejudice" did not result. See United States v. Hibler, 463 F.2d 455, 462 (9 Cir. 1972).
 
 
 37
 Beltran sought to call a Mexican police officer as a witness. The district court refused to allow this testimony. The officer allegedly would have testified that Lazos was wanted for auto theft in Mexico, contrary to Lazos' own testimony. This is extrinsic proof offered on a collateral matter, and is barred under Fed.R.Evid. 608(b), which prohibits the use of specific instances of a witness' conduct to attack credibility. In any event, evidence regarding past criminal acts of Lazos was brought to the jury's attention via cross-examination.
 
 
 38
 Beltran called Teresa Cabrero to the stand to impeach Lazos. Because of a narcotics charge against her, she invoked the privilege against self-incrimination. The court erroneously ruled that this did not make her "unavailable" as a witness for purposes of allowing hearsay testimony under Fed.R.Evid. 804(a)(1). See United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The court did not allow the interpreter with whom she had spoken to testify under a hearsay exception. The question before this court is whether appellant suffered substantial prejudice by this erroneous ruling.
 
 
 39
 Appellant claims that Cabrero would have testified that Lazos told her he was coming to Seattle to purchase wood, that she never heard the name Beltran, and that she was not charged in Seattle because Lazos interceded on her behalf and made another "deal" with the DEA. All of those statements would be contrary to the testimony of Lazos. But none are surprising. Lazos would have every reason to keep his real purpose and his co-conspirators' names quiet. And since Cabrero was Lazos' girlfriend, she naturally would want to exonerate him while negating her own role. Simply put, she would not have been a credible witness. Appellant suffered little prejudice by the absence of her testimony.
 
 
 40
 Sufficiency of the Evidence Against Beltran
 
 
 41
 Appellant does not contest the proof establishing a conspiracy to smuggle marijuana, but only the evidence connecting him with that conspiracy. His argument fails to account for the lower standard of proof for the latter once the conspiracy has been proved beyond a reasonable doubt. Once the existence of a conspiracy is established, then only slight evidence is necessary to link a particular defendant to that conspiracy. United States v. Nunez, 483 F.2d 453, 460 (9 Cir.), cert. denied, 414 U.S. 1076, 94 S.Ct. 594, 38 L.Ed.2d 483 (1973). The record shows the following links between Beltran and the conspiracy:
 
 
 42
 1. Beltran was in San Francisco with Velasquez when Lazos telephoned, staying at the same hotel;
 
 
 43
 2. He accompanied Velasquez to Seattle from San Francisco;
 
 
 44
 3. There were extensive telephonic communications between Beltran and Velasquez in Seattle;
 
 
 45
 4. Beltran discussed picking up the money in Seattle with Lazos in a taped telephone conversation;[2]
 
 
 46
 5. Beltran's uncle was the purported owner of the marijuana and kingpin of the smuggling operation;6. Beltran's brother-in-law helped plan the smuggling operation; and
 
 
 47
 7. Lazos testified at length that he knew Beltran served as "bag man" for the whole operation.
 
 
 48
 There was thus both direct and circumstantial evidence linking Beltran to the conspiracy. It was more than adequate to support the jury's determination. See United States v. Turner, 528 F.2d 143, 162 (9 Cir. 1976) (conspiracy conviction may rest on circumstantial evidence alone).
 
 
 49
 Admission of the Statements of a Co-Conspirator Against Beltran
 
 
 50
 Beltran attacks the introduction of Lazos' hearsay testimony that Velasquez told him that Beltran's role was to "pick up the money for his uncle." He complains that it was not properly admitted as a statement of a co-conspirator and that it violated his rights under the confrontation clause.[3]
 
 
 51
 In order for such a statement to be admissible as a statement of a co-conspirator, the government need only establish through independent evidence a prima facie case of a conspiracy between the declarant and the defendant. See United States v. Calaway, 524 F.2d 609 (9 Cir. 1975); Carbo v. United States, 314 F.2d 718 (9 Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964). Based on evidentiary items already listed, this burden was met.
 
 
 52
 Under Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the question whether statements of co-conspirators are admissible under the confrontation clause must be answered on a case-by-case basis. Four factors were listed in Dutton and have been followed by this court in its analysis. See United States v. Snow, 521 F.2d 730 (9 Cir. 1975); United States v. Baxter, 492 F.2d 150, 177 (9 Cir. 1973), cert. denied, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). These criteria are met here:
 
 
 53
 (1) The statement about what role Beltran was to take in the upcoming operation is not an "assertion of past fact";
 
 
 54
 (2) Velasquez had personal knowledge of the participants in the conspiracy since he was directing the distribution of the marijuana;
 
 
 55
 (3) There is no indication that Velasquez was relying upon faulty recollection; and
 
 
 56
 (4) The evidence does not support any reason for Velasquez to make misrepresentations to Lazos.
 
 
 57
 Therefore, the Dutton criteria are met. Moreover, factors (2) and (3) alone would have been sufficient.
 
 Beltran's Motion for Mistrial
 
 58
 Beltran contends that certain prejudicial remarks by Lazos tainted the verdict against him so that the district court should have declared a mistrial. During the trial, his uncle was identified as the owner of the marijuana. This remark should have had no independent significance for the jury. Moreover, Beltran did not object to the identification of his brother as another participant in the conspiracy. We thus cannot say that this was so prejudicial as to warrant a mistrial.
 
 
 59
 Beltran also objects to testimony connecting him with heroin. Only one remark of this nature was made during the three days of Lazos' testimony, and it was entirely unsolicited by the government. And whatever prejudice might have resulted was cured by an instruction from the judge to the jury to disregard the statement. There was no error in denying the motion for a mistrial.
 
 Jury Instructions
 
 60
 Beltran finally objects to the district court's instruction on false exculpatory statements.[4] In essence, the court said that when a statement is made alleging innocence which later is shown to be false, it is ordinary to infer a consciousness of guilt. See E. Devitt and C. Blackmar, Federal Jury Practice and Instructions No. 11.20 (Rev. ed. 1970).
 
 
 61
 Beltran told a DEA agent that he met Velasquez in Seattle "by chance." This was false, since he stayed with him in San Francisco and traveled with him to Seattle. The instruction given was therefore appropriate since there was evidence in the record of a false exculpatory statement. Cf. United States v. Leysith, 411 F.2d 1184 (4 Cir. 1969).
 
 Conclusion
 
 62
 The appeal of Wood is dismissed. The judgment as to the other appellants is affirmed.
 
 
 
 [1]
 If the first warrant was based on probable cause, it necessarily follows that probable cause also existed for the second warrant. The affidavit in support of it incorporated the prior affidavit and cited the successful execution of the first warrant in support of the informant's reliability
 
 
 [2]
 Beltran disputes the translation of this taped conversation. He claims the word "feria" means "fair" rather than "money," so that he thought Lazos was talking about going to a fair rather than picking up the money. This translation is strained at best. But it need not be disputed since the evidence is to be taken in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)
 
 
 [3]
 Under Fed.R.Evid. 801(d)(2)(E), a statement of a co-conspirator in furtherance of a conspiracy is not considered hearsay
 
 
 [4]
 The government argues that appellant is barred from raising this argument on appeal because he did not object to it at trial. But the other defendants did. The question of whether these objections preserve the issue for Beltran need not be reached, since the instruction was proper