**Robert Lee SKINNER,**
**Plaintiff-Appellant,**

v.

**Harold J. CARDWELL, Warden,**
**Defendant-Appellee.**

**Nos. 76–2988 and 76–2991.**

United States Court of Appeals,
Ninth Circuit.

Nov. 29, 1977.

Rehearing Denied Feb. 10, 1978.

Robert J. Hirsh, Tucson, Ariz., for plaintiff-appellant.

Bruce E. Babbitt, Atty. Gen., Phoenix, Ariz., for defendant-appellee.

Before BROWNING and CARTER, Circuit Judges, and ENRIGHT,* District Judge.

JAMES M. CARTER, Circuit Judge:

This is an appeal by plaintiff Robert Lee Skinner from the denial of his petition for a Writ of Habeas Corpus. Skinner was convicted by jury in the state of Arizona of armed robbery and first degree murder. His conviction was affirmed by the Arizona Supreme Court.

On appeal to this court Skinner contends that the petition for Habeas Corpus was improvidently denied for four reasons: (1) the prosecution allegedly failed to disclose material information; (2) certain attempts by Skinner's counsel to cross-examine were curtailed; (3) a prosecution witness was permitted to take the stand and assert his right not to testify due to self-incrimination; and (4) the trial judge made purportedly inconsistent rulings with respect to prosecution and defense efforts to introduce prior statements of witnesses. Finding none of these claims meritorious, we affirm.

## I. FACTS.

In the fall of 1969, plaintiff Robert Skinner and two friends, Paul Wright and Donnell Thomas, began planning to rob the Crown Liquor Store in Tucson, Arizona. On September 6, 1969, they approached George McDonald, requesting his assistance in the robbery. McDonald asked that they wait until he returned from a planned trip to California. On the 11th of September, 1969, McDonald returned to Tucson from his trip to California. Plaintiff Skinner then renewed the request for assistance in the robbery of the liquor store. He stated that Wright, Thomas and another unknown person were going to rob the store. McDonald refused to assist because he felt that a fellow black man who was working at the store, Mason Branch, might get hurt.

This refusal caused the group to temporarily postpone their plan. However, on the next day, they decided again to commit the robbery. They showed McDonald three pistols—two .22's and either a .25 or a .32 caliber pistol. This still left them one gun short since a fourth partner, David O. Williams, had been enlisted.

Skinner and his three associates, Thomas, Wright and Williams, spent the day together. That evening, seeking the fourth gun, the four men went to the apartment of Lucias Sorrell. Thomas asked Sorrell if he could borrow a gun. Upon learning from Sorrell that they would be charged for the use of the gun, they left to look elsewhere.

Later at about 8:00 p. m. the four men returned to Sorrell's apartment and informed him that they no longer needed his gun. They remained for approximately 15 minutes and then left together. Sorrell remained for about another 15 minutes and then he himself went out. As Sorrell was leaving he observed plaintiff Skinner and the other three mean running across Mansfield Park away from the direction of Crown Liquor Store.

A neighbor heard shots in the liquor store between 8:30 and 8:45 p. m. Other visitors

* Honorable William B. Enright, United States District Judge, Southern District of California, sitting by designation.

of the liquor store were able to establish that the robbery must have taken place shortly after 8:40 to 8:50 p. m. At that time a customer entered the store, found the body of Mason Branch dead on the floor and called the police. The police ascertained that the store had been robbed of $275.00. Mason Branch had been shot at least five times. The cigar box container used to keep money for newspapers in the store was found beside the body of Branch with a fingerprint of David O. Williams on it.

Skinner was tried for armed robbery and murder in the state court of Arizona, The jury returned a verdict of guilty of armed robbery and first degree murder. Plaintiff was sentenced to life in prison on the murder charge and eight to ten years on the robbery charge, both sentences to run concurrently.

On appeal the Supreme Court of Arizona affirmed the conviction. *State v. Skinner*, 110 Ariz. 135, 515 P.2d 880 (1973). Skinner then filed a petition for a Writ of Habeas Corpus on February 18, 1975, in the U.S. District Court for the District of Arizona. The district judge held a hearing and denied the petition.

## II. *ISSUES.*

A. Was plaintiff denied a fair trial because the prosecution failed to disclose material information?

B. Was plaintiff's Sixth Amendment right to confrontation violated when his attorney was denied the right to cross-examine a prosecution witness about information allegedly relevant to impeachment of another prosecution witness?

C. Was plaintiff denied due process of law when a witness was allowed to take the stand and refuse to testify because of his Fifth Amendment right against self-incrimination?

1. We stated in *Brown*:

"In *Agurs*, the Court discusses the prosecutor's obligation to disclose evidence in his possession that would be material to the defense. The standard to be applied to determine how material the evidence has to be to require disclosure varies in three described situations, where:

D. Did the trial judge violate plaintiff's rights to due process or equal protection by its rulings on the admissibility of prior statements?

## III. *DISCUSSION.*

### A. DISCLOSURE OF MATERIAL INFORMATION.

#### 1. *Failure to Disclose a Written Plea Agreement.*

 To procure the testimony of witness Lucias Sorrell the prosecution had to enter a written plea agreement with him. In exchange for Sorrell's testimony against Skinner the prosecutor agreed to reduce certain felony charges against Sorrell to two misdemeanors and to recommend the sentence be time served. Although circumstances at the trial show that the existence of this agreement was known to plaintiff's counsel, no specific request for disclosure of the details of the agreement seems to have been made. The prosecution did not on its own provide a copy of the written agreement to Skinner.

Based on the failure of the prosecution to disclose the written details of the plea agreement, Skinner claims a violation of his right to due process. He contends that the nondisclosure was willful and material wherein it hid from the jury information which impeached the validity of Sorrell's testimony.

The standard by which we test prosecutorial failures to disclose material information is provided by the recent Supreme Court decision in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). We have recently explained that *Agurs* provides for different standards to be applied to different nondisclosures, depending on the nature of the information withheld and the type of request made by the defendant for production of the material.[1] *See United*

1. the prosecution used perjured testimony; or
2. the defense requested specific evidence; or
3. the defense made no request, or only a general one, for exculpatory material."

*United States v. Brown, et al.*, 562 F.2d 1144 at 1150 (9 Cir. 1977), Nos. 76–2925, et al.

*States v. Brown, et al.*, 562 F.2d 1144 (9 Cir. 1977), Nos. 76–2925, et al.

When the material at issue is not perjured testimony and has not been specifically requested by the defense, as in this case, *Agurs* makes it clear that the prosecution has no constitutional duty to routinely disclose information in its possession. The Court explained:

"It necessarily follows that *if the omitted evidence creates a reasonable doubt that did not otherwise exist*, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt, whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." 427 U.S. at 112, 96 S.Ct. at 2401 (Emphasis added). *See also United States v. Brown, supra*, 562 F.2d at 1151.

Furthermore, as we noted in *Brown, supra*, the Court in *Agurs* clarified that the prosecution's constitutional obligation to disclose in these conditions is not "measured by the moral culpability, or the willfulness, of the prosecutor." "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *United States v. Agurs, supra*, at 427 U.S. at 110, 96 S.Ct. at 2400. *See also Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1965).

Accordingly, we must determine whether, based on the entire record, the failure to disclose the actual written form of the plea agreement creates a reasonable doubt about Skinner's guilt that did not otherwise exist. When the record is reviewed in this light, no reasonable doubt can be illustrated.

First, although the actual written details of the agreement were not disclosed, it is certain that both the defense and the jury knew of both the existence and the basic content of the agreement. Sorrell's attorney testified at the habeas corpus hearing that he informed the defense ahead of time of his intention to get "the best deal I can" for Sorrell in exchange for his testimony. Habeas Corpus Reporter's Transcript, Vol. II at 41. The events surrounding Sorrell's testimony confirmed this. Sorrell first took the stand, before any agreement had been reached, on March 4, 1971. At that time he virtually refused to testify by being evasive and belligerently unresponsive. His testimony was completely uninformative. However, on March 8, 1971, during his next examination on the stand, Sorrell became markedly more cooperative and testified fully. The implication was apparent that Sorrell was testifying in return for some favor from the state.

Even so, the jury was not left to speculate. On cross-examination Skinner's counsel obtained from Sorrell the explanation for his sudden willingness to testify. Sorrell explained that during the intervening weekend, he, his attorney and the prosecutor had reached an agreement whereby certain felony charges outstanding against Sorrell would be reduced to misdemeanors in exchange for his testimony.[2] The jury

2. "Q. Lucious, what else did you and Horton Weiss [the government attorney] talk about Saturday besides your being tired when you came into court last week?

"A. He said why didn't I testify and that I testified before, and if I was thinking about it, and everything, and that he was going to have a lawyer talk to me.

"Q. Did he do that for you?
"A. Yeah.
"Q. When did you talk to your lawyer?
"A. The next day.
"Q. Did you talk to Mr. Weiss again?
"A. Yeah.

"Q. Was there a discussion then about these charges that caused you to be in the County Jail being reduced against you?
"A. Well, like he didn't say it. My lawyer did.
"Q. Your lawyer said that?
"A. Yeah.
"Q. He told you the felony charges against you were going to be dropped?
"A. He said they could be dropped if I testified; not dropped but reduced.
"Q. You would have to testify and then they would reduce it to a misdemeanor?
"A. That would be better for me to do that.
"Q. To reduce it?
 * * * * * *

was thus apprised of the existence of the agreement and its basic substance. Only the agreement to recommend time served remained unrevealed.

Second, the content of the plea agreement is relevant for impeachment purposes. In that regard Sorrell's own refusal to testify until he received the concession by the government, his demeanor at trial, and his description of the core of the agreement during cross-examination already provided the defense with the bulk of the impeachment value of the plea agreement. Knowledge of the precise details of the agreement was unlikely to add significantly to its impeachment potential. This is high-lighted by the fact that defense counsel could have inquired of Sorrell about the content of the agreement in greater detail or could have made a specific request for production of the written document by the prosecution but failed to do so. Apparently even the defense at that time was satisfied that the impeachment potential of the plea agreement had been exhausted.

The thrust of Skinner's objection is that the sentencing recommendation of time served was not made known to either the defense or the jury and that this omission is critical enough to interject a reasonable doubt as to Skinner's guilt. However, Sorrell's testimony already had been substantially discredited. Sorrell had been shown to be an admitted user of LSD and an inmate of the Arizona State Hospital. His testimony had been specifically impeached by prior inconsistent statements and the testimony of Willie Dixon who said he saw Sorrell on the night of the crime apparently under the influence of narcotics. Dixon

further testified that Sorrell did not live in the particular apartment he claimed and was not there on the day in question. Finally, the jury knew that outstanding felony charges against Sorrell were being reduced to misdemeanors in exchange for his favorable testimony. The nondisclosure of one detail of the plea agreement which would have proved only that Sorrell *might* be sentenced to time served does not by itself or added to other matters in the record create a reasonable doubt as to Skinner's guilt.

#### 2. *Other Alleged Nondisclosures.*

Skinner also claims a violation of his due process right to a fair trial because of three other alleged nondisclosures. First he contends that Sorrell perjured himself on three occasions by (1) falsely denying the existence of the plea agreement, (2) lying about knowledge of felony charges outstanding against him when he entered the plea agreement, and (3) testifying that a state detective did not procure his release from jail in 1969 in exchange for testimony about his crime in unrelated proceedings. If true, these allegations would call into play the strict *Agurs* test for perjured testimony which requires the verdict to be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs, supra,* at 427 U.S. at 103, 96 S.Ct. at 2397. However, our review of the record reveals no support for Skinner's claims of perjury. Sorrell was admittedly equivocal and evasive. But he did not deny making the plea bargain (he even explained its con-

---

"MR. HIRSH: Can I cross-examine this witness?

"A. Like he said, I mean, it was up to me, you know. I have been back and forth on all this, that something should happen.

\* \* \* \* \* \*

"Q. You talk about having these felony charges reduced. Did that sort of jog your memory as to why you were in the County Jail?

"A. What do you mean?

"Q. Lucious, you just told me a moment ago you didn't know you were charged with any felony.

"A. Yes.

---

"Q. You didn't know what the charges were against you.

"A. Yeah.

"Q. Is that right?

"A. Yes.

"Q. *Did that refresh your memory when you had a little chat with your lawyer and Mr. Weiss that you were charged with some felony?*

"A. *Yes.*

"Q. *You remembered that?*

"A. *Yes.*"

Trial Reporter's Transcript, Vol. VIII at 41–44 (Emphasis added).

tent), did not deny that felony charges against him were reduced for favorable testimony,[3] and did not deny that a detective had earlier obtained his release from jail in connection with previous testimony about this crime.[4]

Second, Skinner objects to the prosecution's failure to disclose prior but separate, agreements made with Sorrell for his testimony about the same crime given at the earlier trials of Skinner's accomplices. Relying on *United States v. Pope*, 529 F.2d 112 (9 Cir. 1976), Skinner argues that agreements relating to separate but connected trials should be disclosed. In *Pope* a witness testified against his two partners in crime in each of their two separate trials pursuant to a plea agreement. In the second trial the witness denied the existence of any agreement relating to his guilty plea. Not only did the prosecutor fail to clarify this lie, he used it in his rebuttal to the jury. Finding that the plea agreement was given for the testimony in *both trials, not merely the first*, this court held the actions of the witness and the prosecutor to be reversible error.

Skinner's reliance on *Pope* in the facts of this case is misplaced. Here the prior agreements were totally separate from the testimony given by Sorrell at Skinner's trial. These earlier agreements contained no requirement, as did the agreement in *Pope*, that Sorrell also testify at the later trial. This fact is evident from Sorrell's virtual refusal to testify at Skinner's trial until a new agreement was entered. We are not willing to hold that the prosecutor must on his own initiative divulge the existence of

---

3. See note 2 *supra*.

4. Regarding his earlier release from prison in exchange for testimony in 1969, Sorrell testified:

"Q. You told me this morning you were released from jail twice. Do you remember when you were released on those two occasions?

"A. No, I don't. I got released but I am not sure when it was.

"Q. Do you remember whether you were released in the month of November 1969 on your own recognizance?

"A. Yes. Somewhere around there.

"Q. Do you remember whether Rex Angeley was with you when you got released on your own recognizance?

"MR. WEISS: I object to that. If he was with him or not is irrelevant.

"MR. HIRSH: Foundation, Your Honor.

"THE COURT: Overruled.

"Q. Was Rex Angeley in court when you were released on your own recognizance?

"A. *Probably.*

"Q. Do you have any recollection as to why and how you were released on your own recognizance?

"MR. WEISS: Immaterial and irrelevant.

"THE COURT: As to why and how?

"MR. HIRSH: As to how he was released on his own recognizance without bail.

"THE COURT: Sustained.

"Q. *Was there any arrangement, Mr. Sorrell, for you to be released on your own recognizance by virtue of Rex Angeley doing something? Do you know?*

"A. *No.*

"Q. You don't know or there was not?

"A. *I don't know.* All I know some lawyer told me to as the judge if I could get out, and the court reporter and stuff like that.

"Q. Then you were arrested a second time after you were released on your own recognizance, were you not?

"A. Yes.

"Q. After that second arrest, do you know when the second arrest was?

"A. I guess.

"Q. When were you released on that charge?

"A. I guess in November some time.

"Q. Were you released on your own recognizance without bail on that charge?

"A. In the same one you are talking about?

"Q. As I understood, you told me you were in jail in October and you were released on your own recognizance, then you got arrested again, did you not?

"A. Yeah.

"Q. *And then you were released again on your own recognizance, were you not, is that right?*

"A. *Yes.*

"Q. And do you know whether or not how you happened to be released on your own recognizance at that time?

"MR. WEISS: Insufficient foundation. Immaterial and irrelevant.

"THE COURT: You may answer.

"A. He said, 'Ask the Judge.'

"Q. The same way?

"A. Yes.

"Q. The same Judge?

"A. I guess.

"Q. The Judge said, 'Let you go'?

"A. Yeah."

Trial Reporter's Transcript, Vol. VIII, 73–75 (Emphasis added).

unrelated plea agreements with a witness regarding testimony at separate trials arising from the same crime.

Moreover, even if the material should have been disclosed, under *Agurs* it cannot be shown that the nondisclosure of these agreements raised any reasonable doubts about Skinner's guilt that did not exist already. The agreements are relevant only as purported impeachment of Sorrell's testimony. Yet they have no formal relationship to Sorrell's testimony because they were not contingent on his favorable testimony against Skinner. Moreover, these prior plea agreements were entered and the testimony given for them more than one year before Skinner's trial. Although proof of these agreements would have been of some value to show Sorrell's propensity to testify about this crime for favors, the jury already knew that Sorrell was testifying in return for favorable treatment. And proof of the agreements could have bolstered Sorrell's credibility by informing the jury that Sorrell's version of the events had remained unchanged throughout three separate direct and cross examinations.

Finally, Skinner contends that the prosecution failed to disclose the existence of three witnesses who might have impeached the testimony of one Willie Dixon who had placed Skinner at the scene of the crime shortly before it occurred. The contention is based on a police report which indicated that two or three witnesses *may* have testified that Dixon was elsewhere than where he claimed to be on the night of the crime. This report was not disclosed until late in the trial.

It is unclear from the report what the testimony of the witnesses would have been. Their whereabouts was unknown to either party. Furthermore, neither the prosecutor nor the trial judge construed the report to be inconsistent with Dixon's testimony. Nevertheless, the court agreed to independently review the contested report and all other undisclosed prosecution reports. He concluded that no material information to the defense had been withheld. Absent a clear showing of abuse, which is not even attempted, the trial court's discretion should be upheld.

## B. REFUSED CROSS–EXAMINATION.

During the testimony of Detective Rex Angeley the defense desired to cross-examine him about facts relating to impeachment of Lucias Sorrell. Sorrell had first testified about the facts of this crime in other proceedings in October, 1969, and again in December, 1969, and March, 1970. In return for that testimony Sorrell had twice been released from jail. Detective Angeley apparently had been instrumental in obtaining these releases for Sorrell and had even helped Sorrell to get a job. Skinner's counsel was refused the right to cross-examine Angeley regarding these two prior releases because the court felt their relevance was not significant to Sorrell's testimony over a year later.

The Sixth Amendment right to confrontation is embodied largely by the right to cross-examine adverse witnesses. *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940); *United States v. Harris*, 501 F.2d 1 (9 Cir. 1974). If the right to effective cross-examination is denied, constitutional error exists without the need to show actual prejudice. *Davis v. Alaska, supra; Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *United States v. Harris, supra* at 9.

However, the defendant does not have the unrestricted right to cross-examine adverse witnesses on any matter desired. Initially the cross-examination must be shown to be relevant. The determination of relevancy is within the discretion of the trial court. *United States v. Trejo*, 501 F.2d 138 (9 Cir. 1974); *Enciso v. United States*, 370 F.2d 749, 751 (9 Cir. 1967).

Next, topics of inquiry which pass the relevancy hurdle are subject to the trial court's further discretion as to the proper extent of cross-examination. In *Alford, supra*, 282 U.S. at 694, 51 S.Ct. at 220 the Supreme Court ruled:

"The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the

trial court. It may exercise a reasonable judgment in determining when the subject is exhausted. *Storm v. United States*, 94 U.S. 76, 85, [24 L.Ed. 42]; *Rea v. Missouri*, 17 Wall. 532, 542–43 [21 L.Ed. 707]; *Blitz v. United States*, 153 U.S. 308, 312, [14 S.Ct. 924, 38 L.Ed. 725]."

*See also Davis v. Alaska, supra,* 415 U.S. at 316, 94 S.Ct. 1105; *United States v. Wood*, 550 F.2d 435, 440 (9 Cir. 1976); *United States v. Harvey*, 547 F.2d 720 (2 Cir. 1976); *United States v. Marshall*, 526 F.2d 1349, 1361 (9 Cir. 1975), *cert. denied*, 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1976); *United States v. Turcotte*, 515 F.2d 145, 151 (2 Cir. 1975, *cert. denied*, 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975); *United States v. Harris*, 501 F.2d 1, 8 (9 Cir. 1974); *United States v. Blackwood*, 456 F.2d 526, 529 (2 Cir. 1972), *cert. denied*, 409 U.S. 863, 93 S.Ct. 154, 34 L.Ed.2d 110 (1972); *United States v. Haili*, 443 F.2d 1295, 1299 (9 Cir. 1971).

Relevancy and the proper extent of cross-examination are closely interrelated. For example, a topic which is highly material deserves extensive cross-examination. But some topics may be of such minimal relevance that the trial court would be justified either in totally prohibiting cross-examination about them or in allowing only limited questioning. *See United States v. Kelley*, 545 F.2d 619, 623 (8 Cir. 1976), *cert. denied*, 430 U.S. 933, 97 S.Ct. 1555, 51 L.Ed.2d 777 (1977); *United States v. Marshall, supra* at 1361; *United States v. Carrion*, 463 F.2d 704 (9 Cir. 1972); *Enciso v. United States, supra.*

When, as in this case, the denied cross-examination relates to impeachment of a witness by proof of specific instances of past conduct relevant to credibility, the discretion of the trial court is further bolstered by Rule 608(b) of the Federal Rules of Evidence. *See United States v. Lustig*, 555 F.2d 737, 748–49 (9 Cir. 1977).

The test for whether cross-examination about a relevant topic was effective, i. e.,

whether the trial court has abused its discretion, is whether the jury is otherwise in possession of sufficient information upon which to make a discriminating appraisal of the subject matter at issue. When the refused cross-examination relates to impeachment evidence, we look to see whether the jury had sufficient information to appraise the bias and motives of the witness. *United States v. Kelley, supra* at 623; *United States v. Turcotte, supra* at 151; *United States v. Baker*, 494 F.2d 1262, 1266–67 (6 Cir. 1974); *United States v. Blackwood, supra.*

Skinner was not denied effective cross-examination under this test. The information that Sorrell had been released earlier for testimony in unrelated proceedings pertaining to this crime was only marginally relevant. The releases were over a year old. Moreover, Sorrell himself had already testified as to the fact of these two releases and, though he was confused about the details, stated that it was "probably" Angeley who was with him when he was released.[5] The jury possessed sufficient knowledge of this collateral matter to adequately appraise Sorrell's motivation and bias.

### C. INVOCATION OF THE FIFTH AMENDMENT BY PROSECUTION WITNESS.

During the trial the prosecution was allowed to call Paul Lawrence Wright, one of the participants in the crime, to the stand. After a few introductory questions Wright was asked four quick questions relating to whether he knew any of the other perpetrators of the crime or had associated with them on the day of the crime. He refused to answer each question on the ground that his answer may incriminate him. At that point the trial judge intervened and, upon ascertaining from Wright's attorney that his client was advised to refuse to answer any questions concerning the crime, prohibited further questioning of Wright.[6]

**5.** *See* note 4 *supra.*

**6.** The testimony was:
 "Q. State your full name, please.
 "A. Paul Lawrence Wright.
 "Q. Do you live in Tucson?
 "A. Yes.
 "Q. How long have you lived in Tucson?

Skinner contends this was unduly prejudicial prosecutorial abuse. His defense at trial was that when the others decided to rob the liquor store he and Wright refused and walked away. Wright's assertion of his right not to incriminate himself allegedly casts doubt upon this version of the facts without availing Skinner an opportunity to cross-examine.

It is not invariably reversible error to permit a witness who may refuse to testify to take the stand. The Supreme Court has focused on two factors helpful in determining when error has occurred. One of these factors deals with prosecutorial misconduct. The other rests upon the conclusion that, in a given case, "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Namet v. United States*, 373 U.S. 179, 186–87, 83 S.Ct. 1151, 1155, 10 L.Ed.2d 278 (1963).

Skinner can complain of no prosecutorial misconduct. He alleges that the prosecutor acted unfairly because he knew Wright would not testify and because he convinced the judge to permit him to call Wright by falsely promising to challenge the assertion of the right when and if made. However, the record shows that neither the judge nor either counsel knew for sure whether Wright would refuse to testify. Both the prosecution and the defense proclaimed their hope that Wright would testify. The judge concluded, "Maybe he will." And the prosecutor was told specifically by the court

not to challenge the right if it was asserted.[7]

Likewise, Skinner cannot complain of unnecessarily suggestive inferences from the assertion of the right by Wright. Each determination on this issue depends on the particular facts of the case at issue. Here the trial court fairly allowed a witness who might testify about highly critical matters to take the stand. After the witness refused to answer only four short and relatively neutral questions further questioning was ended. Notably, after the assertion of the right not to testify by Wright, Skinner's own counsel wanted to continue questioning on the subject of the crime. The brevity of the questioning and the relative neutrality of the questions asked preclude a finding that the defendant was unfairly prejudiced.

### D. TREATMENT OF PRIOR STATEMENTS.

■ Skinner claims a violation of his right to due process and equal protection occurred when the trial court decided to permit a calling party to impeach its own witness by introducing prior inconsistent statements as substantive proof of the matters asserted while refusing the same right to the opposing party. On appeal to the Arizona Supreme Court the trial court was upheld. A new rule on the admissibility of prior statements by witnesses was adopted in Skinner's case. *See State v. Skinner*, 110 Ariz. 135, 515 P.2d 880 (1973). The rule permits a calling party to impeach its own witness with prior inconsistent statements

"A. About six years.
"Q. Do you know a person by the name of Robert Lee Skinner?
"A. I refuse to answer on the grounds it might incriminate me.
 &ast; &ast; &ast; &ast; &ast; &ast;
"Q. Do you know a person by the name of Donnell Thomas?
"A. I refuse to answer on the grounds it might incriminate me.
"Q. Do you know a person by the name of David Oliver Williams?
"A. I refuse to answer on the grounds it might incriminate me.
"Q. Calling your attention to the date of October 4, 1969, did you have occasion to be with Robert Lee Skinner, David Oliver Williams, and Donnell Thomas?

"A. I refuse to answer on the grounds it might incriminate me."
[At this point the court interrupted and prohibited further questioning of the witness.]
Trial Reporter's Transcript, Vol. VI at 183–84.

7. After a lengthy discussion between the court and counsel, the court decided that Wright might testify and overruled Skinner's motion to prohibit him from taking the stand. Then the court, anticipating the prosecutor's promised challenge of the right not to testify if asserted by Wright, warned:

"I don't intend to get into an argument later, Mr. Weiss, if he takes the Fifth, to these matters. It is the Court's opinion that he has the right to take it."
Trial Reporter's Transcript, Vol. VI at 148.

admitted as substantive proof. The opposing party may impeach with prior inconsistent statements, but cannot introduce them substantively. This new Arizona rule of evidence is not suspect under the confrontation clause. *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

Although the *Green* rationale would have permitted the Arizona courts to adopt a rule which admits evidence of prior inconsistent statements by either party as substantive proof, neither due process nor equal protection requires that solution. The rule draws a rational distinction between the calling and opposing parties. The rule was evenly applied in Skinner's case. No violation occurred.

## IV. CONCLUSION.

Skinner was provided with a fair trial by the state of Arizona. The judgment of the district court denying the petition for a Writ of Habeas Corpus is *affirmed.*