**Lee CHAMBERLAIN, Jr., Petitioner,**

v.

**C.K. PLILER, Warden, Respondent.**

**No. CV 03–5194–DOC (RNB).**

United States District Court,
C.D. California.

Feb. 9, 2004.

1130

Maureen L. Fox, Maureen L. Fox Law Offices, Los Gatos, CA, for Petitioner.

Lee Chamberlain, Jr., Represa, CA, Pro se.

Xiomara Costello, Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

CARTER, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, all the records and files herein, and the recommendation of the United States Magistrate Judge. Objections to the Report and Recommendation have been filed herein. Having made a *de novo* determination of those portions of the Report and Recommendation to which objection has been made, the Court concurs with and adopts the findings, conclusions and recommendations of the Magistrate Judge.

IT IS ORDERED that Judgment be entered denying the Petition and dismissing this action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order and the Judgment herein by United States mail on petitioner, petitioner's counsel and counsel for respondent.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

BLOCK, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable David O. Carter, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

### PROCEEDINGS

On August 18, 2003, petitioner filed a Petition for Writ of Habeas Corpus by a

Person in State Custody ("Pet.") herein. On November 7, 2003, respondent filed an Answer to the Petition ("Ans."), to which petitioner (then represented by counsel) filed a Traverse ("Trav.") on November 26, 2003.

Thus, this matter now is ready for decision.

## PROCEDURAL HISTORY

On or about May 16, 2000, a Los Angeles Superior Court jury found petitioner guilty of one count of second degree robbery, one count of assault with a deadly weapon ("ADW"), one count of mayhem, and one count of torture. In addition, the jury found true the special allegations that petitioner personally used a deadly weapon (i.e., broken bottle), and personally inflicted great bodily injury upon the victim during the commission of the above offenses. (*See* 1 Clerk's Transcript ["CT"] 188–91, 193–95; 5 Reporter's Transcript ["RT"] 2703–06).[1] In a bifurcated trial, the jury found true the special allegations that petitioner had suffered two prior felony convictions (i.e., a 1985 conviction for second degree robbery, and a 1992 ADW

conviction). (*See* 1 CT 192, 197; 5 RT 2759–60).[2] On June 5, 2000, immediately prior to sentencing, the trial court found that petitioner's two prior felony convictions were serious or violent felony convictions. The trial court then proceeded to sentence petitioner in accordance with California's "Three Strikes Law"[3] to state prison for an indeterminate term of 61 years to life. (*See* 1 CT 204–08; 5 RT 3010–11).[4]

Petitioner appealed his conviction and sentence to the California Court of Appeal, raising *inter alia* claims corresponding to the first, fifth and sixth claims being alleged in the Petition herein. (*See* Ans. Exh. A). In an unpublished decision issued on July 6, 2001, the California Court of Appeal found that the trial court had erred in relying on the preliminary hearing transcript, rather than the trial transcript, to determine whether petitioner's 1992 ADW conviction was a serious or violent felony conviction. Accordingly, the Court of Appeal reversed and remanded the matter to the trial court for a retrial of the nature of the 1992 ADW conviction and for a recomputation of the sentence. In all other respects, the Court of Appeal affirmed the judgment. (*See* Ans. Exh. B).

---

1. The jury was deadlocked on two counts which charged assault with intent to commit rape and kidnapping to commit rape. The trial court declared a mistrial as to those counts. (*See* 1 CT 67, 69, 196; 5 RT 2707–09).

2. The trial court earlier had found that petitioner was the person identified in the prison packets pertaining to the two prior felony convictions. (*See* 1 CT 115–16; 5 RT 2431; *see also* 5 RT 2733).

3. Cal.Penal Code § 667(e)(2)(A) provides in pertinent part: "If a defendant has two or more felony convictions . . ., the term for the current felony shall be an indeterminate term of life imprisonment with a minimum term of . . . . [¶] . . . [¶] (ii) Imprisonment in the state prison for 25 years."

4. Petitioner's sentence was as follows: 25 years to life for the second degree robbery offense, plus 5 years for each of the prior serious or violent felony conviction findings, plus 1 year for the personal weapons use finding, plus a stayed 3–year term for the personal infliction of great bodily injury finding; a consecutive term of 25 years to life for the ADW offense, plus a stayed 1–year term for the personal weapons use finding, plus a stayed three-year term for the personal infliction of great bodily injury finding; and stayed terms of 25 years to life for the mayhem and torture offenses, plus stayed 1–year terms for the personal weapons use findings, plus stayed 3–year terms for the personal infliction of great bodily injury findings. (*See* 1 CT 204–08; 5 RT 3010–11).

Petitioner then filed a Petition for Review with the California Supreme Court, wherein he alleged *inter alia* claims corresponding to the first, second, fifth and sixth claims being alleged in the Petition herein. (*See* Ans. Exh. C). On October 10, 2001, the California Supreme Court summarily denied the Petition for Review without citation of authority. (*See* Ans. Exh. D).

On remand, the trial court retried the issue of whether petitioner's 1992 ADW conviction was a serious or violent felony conviction. The trial court found that petitioner's 1992 conviction was a serious felony conviction, denied petitioner's motion to recompute the sentence, and allowed the original sentence to stand. (*See* 2 CT 29; 1/24/02 RT 54).

Petitioner then appealed his sentence to the California Court of Appeal, raising claims corresponding to the first through fourth claims being alleged in the Petition herein. (*See* Ans. Exh. E). In an unpublished decision issued on December 20, 2002, the California Court of Appeal rejected petitioner's claims and affirmed the judgment. (*See* Ans. Exh. F).[5]

In his ensuing Petition for Review to the California Supreme Court, petitioner alleged claims corresponding to the third and fourth claims being alleged in the Petition herein. (*See* Ans. Exh. G). On March 5, 2003, the California Supreme Court summarily denied the Petition for Review without citation of authority. (*See* Ans. Exh. H).

**SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL IN SUPPORT OF THE UNDERLYING CONVICTIONS**

Since petitioner is not contesting the sufficiency of the evidence to support his underlying convictions for second degree robbery, ADW, mayhem and torture, the following summary is taken from the "Evidence at Trial" section of the first California Court of Appeal opinion (*see* Ans. Exh. B at 104–08):

Paula Johnson testified that on October 26, 1999, between 2:00 a.m. and 3:00 a.m., she was walking on 38th Street towards Western Avenue after dropping a friend at home. A man carrying a backpack and purse started to follow her. She identified the man in court as appellant. He spoke to her, asking where he could find "dope." She told him to go up Western. He asked if she wanted a drink. He told her he had been drinking and only a little was left. She reached for the bottle he was holding, but he put the bottle to her mouth and started pouring. She tried to run away. The next thing she knew, she was on the ground with glass in her hair and something warm running down her face. Appellant grabbed her and asked her for money. He put the broken bottle up to her neck. Because she had put her hands up to protect herself, one of her hands was cut. She gave him money, between $8 and $11. Her change was in a plastic bag. After she handed over the money, appellant searched her and found an additional penny.

Appellant put the broken bottle against her back and forced her to walk down a street and alleyway, saying he intended to have sex with her and then kill her. During this time, he cut her face and hit her in the mouth, causing her to lose several teeth. He rubbed the broken glass on her breast, threatening to cut it off. He told her that if she did not cooperate, the same thing would happen to her that happened to the person who owned the purse. He

---

5. The Court of Appeal declined to revisit the issues raised by petitioner which corresponded to the first two claims being alleged in the Petition herein, since those issues already had been decided adversely to petitioner in his original appeal. (*See* Ans. Exh. F at 195–96).

forced her to lift her shirt. At some point, he tried to take her pants off or force her to take her pants off near the steps of a house. At another point, she got on her knees and prayed.

Johnson tried to get blood on appellant in case something happened to her. She had on slippers which he forced her to take off because they were slowing her down. Later, she testified that she kicked off one slipper in order to leave evidence where someone could find it. While appellant was forcing her to walk down the street or alleyway, Johnson tried to get away by seeking help from a man who was going into his house. She also tried to convinced appellant that the man had drugs in order to distract him. The man did not help her. After her unsuccessful appeal to the man for help, appellant beat her, cut her face, and threatened to kill her. He then walked away.

Once appellant was gone, Johnson made her way back to Western where police cars and an ambulance were parked. She described her assailant to the police. While she was being treated by paramedics, the police told her they had someone in custody. Moments later, she identified appellant who was seated in the back of a police car at the time. She believed she told the officers who initially interviewed her about everything that had happened during her ordeal.

Johnson had surgery on her face twice to repair the damage and get pieces of glass out. She received stitches. One tooth was knocked out and two others had to be pulled.

On cross-examination, Johnson admitted she and her friend had drunk five to seven malt liquors that night approximately three hours before she encountered appellant. She had smoked a quarter gram of cocaine earlier that day.

Los Angeles Police Department Office (sic) Chuong Bao testified that he and his partner responded to a call at 3:15 a.m. By the time they arrived at 38th and Western, another officer was interviewing Johnson. Johnson's face was bleeding. Officer Bao heard over the radio that the suspect was wearing a green shirt and black pants, carrying a backpack, and was last seen walking northbound on a nearby street. An air unit broadcast the location of a man running across Exposition and illuminated the suspect. Officer Bao and his partner approached the suspect, who he identified in court as appellant. Appellant was wearing a light green shirt and black pants and wearing a backpack. He began to run and Officer Bao chased him. When Officer Bao caught up with appellant, appellant tried to hit him. Eventually four officers were able to take appellant into custody. Even after being placed in the police car, appellant was out of control and combative. He was taken to Johnson, who identified him as the person who robbed her.

Officer Bao took custody of the backpack. He searched it and found a woman's black leather purse. Within that was a white plastic bag with blood on it. Inside the bag, was a white envelope which contained documents bearing the name Lee Chamberlain.

Appellant was taken to a hospital. His behavior indicated he was under the influence of alcohol or drugs. A mask was placed on his face because he was spitting at officers and hospital staff. He was put in restraints. He told a nurse not to touch him, calling her a "mother-fucking white bitch."

On cross-examination, Officer Bao testified that appellant was pepper-sprayed twice without any noticeable effect, and smelled strongly of alcohol. The officers took appellant to the hospital because they believed he was under the influence of alcohol or some kind of narcotic and might have overdosed. Defense counsel asked

Officer Bao to describe appellant's actions at the hospital in trying to break his restraints and spitting at hospital personnel. Appellant's counsel also brought out that the officers found only $6.49 on appellant when he was booked.

Los Angeles Police Department Officer Martin Espinoza and his partner, Officer Rafael Rodriguez, also responded to the early morning call. They saw Johnson sitting on the curb at 38th and Western holding a towel to her face. She had blood on her and was crying. She described her attacker as a Black male wearing a green shirt and black pants carrying a black purse and a bottle of brandy. When Officer Espinoza received word that a suspect was in custody; he gave Johnson a field admonition, warning her that the fact that a person was in handcuffs or in a police car did not mean that was the person who committed the crime.

The defense called Officer Rodriguez who testified that Johnson told the officers that she had been cut on the hand with a bottle and had been dragged approximately 10 feet. She did not tell the officers that she was taken down an alleyway or walkway or taken into an abandoned house and forced to lie down and unbutton her pants. She did not tell them that appellant had threatened to cut off her breast. She did not tell them about being forced to drink alcohol or about trying to get help from a person in the street. She did tell the officers that appellant had demanded money and sex, cut her hand and face, and threatened to cut her neck. She also told the officers that her attacker said he was a killer and that he would "do [her] like [he] did the other bitch."

Los Angeles Police Department Detective Richard Ulley testified that Johnson had told him essentially the same version of events as had been related in her testimony. In his investigation, he did not find blood in areas where Johnson had said she had been taken by appellant, could not locate the man she remembered asking for help, and found no evidence of an assault on another woman. He testified that there were no fingerprints on the pieces of glass taken into evidence.

Carl Matthies, a criminalist for the Los Angeles Police Department, testified that he tested a piece of the shirt appellant was wearing and blood samples taken from appellant and Johnson. There were two different types of blood on the shirt. The bloodstains were consistent with appellant's and Johnson's blood types, but he could not say positively that it was their blood because of the number of people who share the characteristic he noted in the stains.

## SUMMARY OF PROCEEDINGS CONCERNING THE NATURE OF PETITIONER'S 1992 ADW CONVICTION

At the original hearing on whether petitioner's two prior felony convictions constituted serious or violent felony convictions, petitioner's counsel argued that petitioner's 1992 ADW conviction could not be considered a "strike" because the record did not reflect that petitioner personally used a deadly weapon.[6] Even though petitioner's counsel argued that under California law the trial court could not rely on the preliminary hearing transcript to make the personal weapons use determination, the trial court proceeded to find that petitioner had suffered a serious or violent felony

---

**6.** At the time of petitioner's sentencing, an ADW conviction could qualify as a "strike" under Cal.Penal Code § 1192.7(c)(24) (presently § 1192.7(c)(23)) only if petitioner's "personal use of a weapon" was proven. *See*

*People v. Equarte,* 42 Cal.3d 456, 465, 722 P.2d 890, 229 Cal.Rptr. 116 (1986); *People v. Solis,* 90 Cal.App.4th 1002, 1018, 91 Cal. App.4th 341A, 109 Cal.Rptr.2d 464 (2001).

conviction in 1992 based on testimony in the preliminary hearing transcript that petitioner stabbed the victim. (*See* 5 RT 3002–03).

The California Court of Appeal concluded that the trial court had erred in relying on the preliminary hearing transcript to find that petitioner had personally used a weapon. The Court of Appeal remanded the matter to the trial court for the purpose of determining, based on its review of the trial transcript, whether petitioner had personally used a weapon. (*See* Ans. Exh. B at 120–22).

On Tuesday, January 22, 2002 (the date set for the retrial), the trial court stated that the 1992 trial transcript, which the trial court had ordered on January 14, 2002 pursuant to the prosecutor's request, had not arrived. The trial court expressed its willingness to proceed with the retrial without the trial transcript. After the parties announced their readiness for the retrial, petitioner objected on hearsay grounds to the prosecutor calling the prosecutor from the 1992 trial to testify. The prosecutor's initial response was that the trial court could take judicial notice of the official court file of the 1992 case (which contained the amended complaint, the jury verdict form, and the abstract of judgment). The prosecutor further responded that the prosecutor's testimony about the 1992 victim's testimony was being offered for a non-hearsay purpose. The trial court sustained petitioner's objection. (*See* 1/22/02 RT 1–6, 8).

The prosecutor then requested a continuance on the ground that the ordered transcript was not available through no fault of the prosecution. The prosecutor stated that he was informed the court reporter (Bettie Yasui), who the trial court had ordered to appear in court (pursuant to the prosecutor's request), had been in an automobile accident; and that he believed the court reporter would return later that week. Petitioner objected to any continuance, arguing that the prosecutor had not acted diligently since he had failed to subpoena the court reporter and failed to request that the court reporter services find the court reporter's notes in archives and designate another court reporter to transcribe or read them. The trial court pointed out that the remittitur was not filed in the Superior Court until December 13; and that the prosecutor had submitted the motion for an order for the trial transcript and for the court appearance of the court reporter on January 14, only four days after first appearing on the matter (petitioner apparently could not be present in court until January 10). Before ruling on the continuance request, the trial court asked the prosecutor to check the status of the court reporter. (*See* 1/22/02 RT 4, 6–9).

After a recess, the prosecutor advised the trial court that he had been informed that the court reporter had been out since January 3, 2002 as a result of a car accident; that the court reporter had provided documentation she was still recovering; that the court reporter was not present for work that day; and that the court reporter was expected to return to work the following Monday. The prosecutor further advised the trial court that he had been informed that there was a court reporter to handle cases for retired or long-term injured court reporters; that a copy of the order could be forwarded to the court reporter's home; and that, in the event the court reporter could not comply with the order, another court reporter would promptly be assigned to pull the notes from archives and appear in court. The prosecutor requested a ten-day continuance. Petitioner again objected to the continuance, claiming that the prosecution had not been diligent and that petitioner had "never waived time." (*See* 1/22/02 RT 10–11).

The trial court then announced its intention to telephone the court reporter to determine her availability to testify or, if possible, to read her notes into the record. After an unsuccessful attempt to contact the court reporter (the trial court left a message on the answering machine), the trial court found that there was good cause to trail the retrial for a day. Petitioner's counsel claimed that the fact that the trial court, rather than the prosecutor, called the court reporter violated petitioner's rights. Petitioner's counsel further claimed that a jury should make the determination about whether petitioner was the person who committed the offense and whether the offense was a serious or violent felony. The trial court indicated that, even though it believed the verdict form was enough to show that petitioner had personally used a weapon, it wanted to put over the matter in order to have the opportunity to consider the trial transcript. The trial court denied petitioner's motion for a jury trial. (*See* 1/22/02 RT 12–20).

When the trial court stated that the court reporter had been ordered to appear in court, petitioner's counsel argued that "[t]he court can't order someone here by a document." The trial court responded that it could order a court reporter to be present and to bring certain documents and that it did not need a subpoena because it was not a litigant. (*See* 1/22/02 RT 18).

Later that day, the trial court told the parties it had been informed that the court reporter was "medically unavailable," and that the court reporter's notes would be pulled from archives and another court reporter would read the notes in court the following day. (*See* 1/22/02 RT 21–22).

The next day (January 23), prior to any testimony from court reporter Arnela Sims, petitioner objected to the proceedings and moved for the trial court to exclude the testimony of the court reporter and alternatively to recuse itself, on the ground that the trial court took over prosecutorial duties ("the trial court stepped into the shoes of the prosecutor") when it made telephone calls concerning the availability of the court reporter and arranged for the notes to be brought from the archives. The trial court denied the motion, stating that its contact with the court reporter's office was simply an attempt to enforce its January 14, 2002 order for the trial transcript and the court reporter. The trial court trailed the matter until the next day. (*See* 1/23/02 RT 23–27).

The next day (January 24), prior to any testimony, petitioner's counsel renewed petitioner's motion for the trial court to exclude the testimony of court reporter Arnela Sims and alternatively to recuse itself. Petitioner's counsel argued that the trial court did not have jurisdiction over an "unnamed person" so the order was not valid. Petitioner's counsel further argued that the trial court had improperly taken over the prosecutor's duties to the extent that it had ordered another court reporter to make the transcriptions and bring them to court.[7] After noting that it had been unaware the order had not been served on the court reporter ("the court had received conflicting indications that in fact she was back at work"), the trial court denied the renewed motion: "[A]n order such as this is made to go find the records and bring them to court." (*See* 1/24/02 RT 28–31).

The trial court proceeded to hear testimony from Ms. Sims. Ms. Sims testified

---

7. On January 24, 2002, the trial court signed a Court Order For Expedited Transcript (prepared by the prosecution) which ordered Court Reporter Arnela Sims to prepare a cer- tified transcript of the "trial testimony of witness Francisco Javier Camaren Castro" given on July 9, 1992. (*See* 2 CT 27).

that she had prepared the transcript of petitioner's trial on July 9, 1992 from Bettie Yasui's notes. During cross-examination, Ms. Sims testified that when she received the notes the day before, she was told by her supervisor to look for the issue concerning the victim being stabbed; that that morning she had prepared the transcription of the victim's testimony only; and that she had not reviewed Ms. Yasui's remaining notes. The prosecutor moved to admit the victim's transcribed testimony and Ms. Yasui's raw notes. Over the petitioner's objection, the trial court admitted the victim's transcribed testimony. (*See* 1/24/02 RT 31–46).

Petitioner did not object to the admission of Ms. Yasui's notes, but petitioner moved to have all of the notes (including the testimony of police officer and civilian witnesses and the defense case) read into the court record. The trial court denied petitioner's motion, and admitted the notes. (*See* 1/24/02 RT 46–47).

After the prosecution rested, petitioner moved to have the entire trial testimony read into the record. The trial court denied that motion. When asked if petitioner had anything further, petitioner's counsel responded, "Not as to testimony." Petitioner's counsel did not have any objection to Ms. Sims being excused. (*See* 1/24/02 RT 47).

Pursuant to the prosecutor's earlier request, the trial court agreed to take judicial notice of the 1992 court file. The court then took a recess in order to review the 41–page transcript of the victim's testimony. After the recess, petitioner rested his case without calling any witnesses to testify. (*See* 1/24/02 RT 48–50).

Counsel proceeded to argue the matter. Petitioner's counsel argued *inter alia* that the trial court should review the entire trial testimony, since "[t]he Court of Appeal never made any mention of the victim's testimony or anything specific as to

any one person, rather it was a retrial of the nature of the prior allegation." However, the trial court expressed its belief that the Court of Appeal had found that the trial court had improperly relied on the preliminary hearing transcript because "there was a possibility that the witness could have testified at trial differently." The trial court concluded that petitioner had personally used a deadly weapon (i.e., a knife), and had suffered a "strike," based on its review of the following documents: the amended information which charged petitioner in Count Two with committing ADW (i.e., a knife) by means of force likely to produce great bodily injury; the abstract of judgment which indicated that petitioner in Count Two was convicted of ADW; the jury's verdict form which found that petitioner in Count Two was guilty of ADW, i.e., a knife; and the trial testimony of the victim "who in fact says that the defendant came up to him, asked for money and when he said he didn't have any money, the defendant hit him in the side of the head. The victim pushed the defendant away after which the defendant pulled out a knife and threw a blow at me. The victim was then hit in the head with a shiny object cutting him and leaving the scar which the court took notice of." (*See* 1/24/02 RT 50–54).

## PETITIONER'S CLAIMS

1. The trial court's finding that petitioner personally used a deadly weapon with respect to his 1992 ADW conviction violated petitioner's rights to a jury trial and due process. (*See* Pet. at ¶ 10a; Trav. at 4–9).

2. The trial court's retrial on the issue of whether petitioner personally used a deadly weapon with respect to his 1992 ADW conviction subjected him to double jeopardy. (*See* Pet. at ¶ 10b; Trav. at 9–12).

3. The trial court failed to review the entire transcript of the 1992 trial and prohibited any evidence outside the record of the 1992 ADW conviction, in violation of petitioner's right to present a defense. (*See* Pet. at ¶ 10c; Trav. at 13–16).

4. The trial court assumed the prosecutorial duties at the retrial of the issue about whether petitioner's 1992 ADW conviction was a serious or violent felony conviction, in violation of petitioner's right to due process. (*See* Pet. at ¶ 10d; Trav. at 16–18).

5. The trial court instructed the jury with CALJIC No. 17.41.1, in violation of petitioner's Sixth and Fourteenth Amendment rights. (*See* Pet. at ¶ 10e; Trav. at 18–20).

6. The trial court prohibited petitioner from asking a detective questions about the existence of an arrest warrant for the victim, in violation of petitioner's Sixth and Fourteenth Amendment rights. (*See* Pet. at ¶ 10f; Trav. at 21–22).

## STANDARD OF REVIEW

The standard of review applicable to petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

Further, a state court factual determination must be presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1)(as amended).

■ Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

■ Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See Williams*, 529 U.S. at 391, 413, 120 S.Ct. 1495. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); *Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams*, 529 U.S. at 406, 120 S.Ct. 1495. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8, 123 S.Ct. 362.

■ State court decisions which are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an

*unreasonable* determination of the facts.'" *Early,* 537 U.S. at 11, 123 S.Ct. 362 (citing 28 U.S.C. § 2254(d) and adding emphasis). A state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular. case. *See Williams,* 529 U.S. at 406–10, 413, 120 S.Ct. 1495 (*e.g.,* the rejected decision· may state *Strickland* rule correctly but apply it unreasonably); *Woodford v. Visciotti,* 537 U.S. 19, 24–27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)(per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford, supra; Williams,* 529 U.S. at 413, 120 S.Ct. 1495. An "unreasonable application" is different from an erroneous or incorrect .one. *See Williams,* 529 U.S. at 409–10, 120 S.Ct. 1495; *see also Woodford,* 537. U.S. at 25, 123 S.Ct. 357; *Bell v. Cone,* 535 U.S. .685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

**A.· *Petitioner is not entitled to habeas relief with respect to his claim that he was entitled to a jury trial on whether he personally used a deadly weapon with respect to his 1992 ADW conviction.***

■ Petitioner contends that his rights to a jury and due process were violated when the trial court, rather than the jury, determined whether petitioner ·personally used a deadly weapon with respect to his 1992 ADW conviction. (*See* Pet. at ¶ 10a; Trav. at 4–9).

The Supreme Court has held that a criminal defendant does not have a federal constitutional right to a jury trial on the

truth of a prior felony conviction allegation. *See Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *Almendarez–Torres v. United States,* 523 U.S. 224, 239–47, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)(rejecting the petitioner's claim that, because his prior felóny conviction increased the maximum sentence to which he was ·exposed, his recidivism qualified as an "element" of the current offense which the Government was constitutionally required to state in the indictment 'and prove to the jury beyond a reasonable doubt); *see also United States v. Pacheco–Zepeda,* 234 F.3d 411, 413–15 (9th Cir.2000)(rejecting the defendant's argument that *Apprendi* limited *Almendarez–Torres* to cases where a defendant admits the prior aggravated felony convictions on the record), *cert. denied,* 532 U.S. 966, 121 S.Ct. 1503, 149 L.Ed.2d 388 (2001).

■ The California Court of Appeal opinion reflects that, in rejecting this claim when petitioner raised it in his first appeal, the Court of Appeal was mindful of the United States Supreme Court's recent decision in *Apprendi.* The California Court of Appeal reasoned as follows (*see* Ans. Exh. B at 120) [8]: ·

As we understand appellant's position, he believes that because the fact that he personally used a dangerous weapon or caused great bodily harm was never specifically submitted to a jury and proved beyond a reasonable doubt to a jury, it could not be used to increase the penalty

---

**8.** Under *Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), it may be presumed that the California Supreme Court, by its silent denial of the Petition for

Review raising the same claims, did not intend to change the California Court of Appeal's reasoned decision rejecting them. *See Ylst,* 501 U.S. at 803–04, 111 S.Ct. 2590.

for his crimes. We do not agree with his interpretation of Apprendi . . .

By carving out an exception for proof of a prior conviction, we believe the Supreme Court [in Apprendi], left state courts free to undertake the analysis set forth in Kelii[9] to ascertain the facts underlying a prior conviction for assault with a deadly weapon which had been submitted to a jury and previously found to be true beyond a reasonable doubt. In the case of a prior conviction which might or might not constitute a strike, such as conviction under section 245, subdivision (a)(1), the trial court searches the underlying record for clear evidence of the type of injury suffered by the victim or the identity of the person who wielded the dangerous or deadly weapon. If there was any dispute about these matters and the issue was not resolved by the jury, the prior offense must be deemed ambiguous and not counted as a strike. If, on the other hand, the record is clear that the offense involved personal use of a dangerous weapon or actual infliction of great bodily harm, the court is free to impose the greater sentence. As the court said in Kelii, this is the type of inquiry traditionally performed by judges as part of the sentencing function. [footnote omitted] We do not believe the holding in Apprendi undercuts the foundation for the decision in Kelii.

Petitioner has failed to cite, and the Court has been unable to locate, any United States Supreme Court holding that the exception carved out in *Apprendi* does not encompass a determination of whether a prior conviction qualifies as one of those enumerated under the applicable sentence enhancement statute. Nor has petitioner cited any controlling Ninth Circuit (or other Circuit authority) so construing *Apprendi*. Indeed, as respondent points out,

the argument that the *Apprendi* exception is limited to the fact that a prior conviction exists has been rejected by other Circuit courts. *See, e.g., United States v. Morris,* 293 F.3d 1010, 1012 (7th Cir.), *cert. denied,* 537 U.S. 987, 123 S.Ct. 428, 154 L.Ed.2d 354 (2002); *United States v. Kempis–Bonola,* 287 F.3d 699, 703 (8th Cir.)(rejecting same argument made by petitioner here— i.e., that the determination of whether a prior conviction is "aggravated" requires the finding of facts beyond the mere fact of conviction and therefore falls outside the *Apprendi* recidivism exception), *cert. denied,* 537 U.S. 914, 123 S.Ct. 295, 154 L.Ed.2d 196 (2002); *United States v. Santiago,* 268 F.3d 151, 156 (2d Cir.2001), *cert. denied,* 535 U.S. 1070, 122 S.Ct. 1946, 152 L.Ed.2d 849 (2002). Accordingly, the Court has no basis for finding or concluding that the California courts' rejection of petitioner's claim either was contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.

■ Moreover, the Court concurs with respondent that, even assuming arguendo that the determination of whether petitioner personally used a knife during the 1992 assault was a factual question which should have been submitted to a jury as a matter of clearly established Supreme Court law, petitioner still would not be entitled to habeas relief. Petitioner has adduced no evidence to contradict the evidence considered by the trial court, which included the victim's testimony that petitioner had pulled out a knife and struck the victim in the head with a shiny object cutting him and leaving a scar. The Court therefore finds that the alleged error, if any, did not have a substantial and injurious effect or influence on petitioner's sentence. *See Brecht v. Abrahamson,* 507 U.S. 619, 637–

**9.** *People v. Kelii,* 21 Cal.4th 452, 981 P.2d 518, 87 Cal.Rptr.2d 674 (1999).

38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Summerlin v. Stewart,* 341 F.3d 1082, 1121 (9th Cir.)("*Apprendi* errors are not structural and therefore are subject to harmless-error analysis."), *pet. for cert. granted on other grds,* —— U.S. ——, 124 S.Ct. 833, 157 L.Ed.2d 692 (2003).

**B.** **Petitioner is not entitled to habeas relief with respect to his double jeopardy claim.**

■ Petitioner contends that his double jeopardy rights were violated when the trial court retried the issue of whether petitioner personally used a deadly weapon with respect to his 1992 ADW conviction. (*See* Pet. at ¶ 10b; Trav. at 9–12).

■ The Fifth Amendment guarantee against double jeopardy (which is enforceable against the States through the Fourteenth Amendment) consists of three separate constitutional protections: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *See North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).[10]

The California Court of Appeal addressed the double jeopardy issue in its original decision.[11] Citing *Cherry v. Superior Court,* 86 Cal.App.4th 1296, 104 Cal. Rptr.2d 131, *cert. denied,* 534 U.S. 854, 122 S.Ct. 125, 151 L.Ed.2d 80 (2001), the Court of Appeal stated that retrial of the ruling on the seriousness of the prior conviction was not barred by double jeopardy. (*See* Ans. Exh. B at 121–22). The *Cherry* court had specifically relied on *Monge v. California,* 524 U.S. 721, 734, 118 S.Ct. 2246, 141

L.Ed.2d 615 (1998), where the Supreme Court had held that "the Double Jeopardy Clause does not preclude retrial on a prior conviction allegation in the noncapital sentencing context." *See Cherry,* 86 Cal. App.4th at 1301–02, 104 Cal.Rptr.2d 131. Although petitioner asserts that *Monge* has been superseded by *Apprendi* (*see* Trav. at 10), he has failed to cite a single federal case so construing or applying *Apprendi.*

The Court therefore has no basis for finding or concluding that the California courts' rejection of petitioner's double jeopardy claim either was contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. . .

**C.** **Petitioner is not entitled to habeas relief with respect to his claim directed to the trial court's failure to review the entire 1992 trial transcript and alleged prohibition of evidence outside the record of conviction.**

■ Petitioner contends that his right to present a defense was violated when the trial court failed to review the entire transcript of the 1992 trial and prohibited any evidence outside the record of the 1992 ADW conviction. (*See* Pet. at ¶ 10c; Trav. at 13–16).

In *Gill v. Ayers,* 342 F.3d 911 (9th Cir. 2003), the Ninth Circuit construed longstanding Supreme Court precedent as holding that a defendant has a Fourteenth Amendment due process right to present a defense in a proceeding to de-

**10.** *Pearce* was overruled on other grounds by *Alabama v. Smith,* 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

**11.** As noted above, when petitioner raised the double jeopardy claim in his second appeal,

the Court of Appeal declined to revisit the issue since it already had been decided adversely to petitioner in his original appeal. (*See* Ans. Exh. F at 195–96).

termine whether he personally used a deadly or dangerous weapon for purposes of qualifying a prior ADW conviction as a "strike." *See* 342 F.3d at 917–19. However, the Ninth Circuit also has held that the exclusion of non-probative or "marginally relevant" evidence does not violate a defendant's due process right to present a defense. *See United States v. Blajos,* 292 F.3d 1068, 1073 (9th Cir.), *cert. denied,* 537 U.S. 893, 123 S.Ct. 168, 154 L.Ed.2d 160 (2002); *United States v. Rubio–Topete,* 999 F.2d 1334, 1339–40 (9th Cir. 1993).

Here, in rejecting petitioner's claim, the California Court of Appeal recapitulated what had transpired at the retrial. The prosecution had proffered the original certified copy of the victim's trial testimony, which Ms. Sims had prepared from Ms. Yasui's notes. After the prosecution rested, petitioner's counsel asked that "the entire testimony from the trial be read into the court record so the court can consider everything that was said and all the witnesses." The trial court denied the motion. When asked if the defense had anything further, petitioner's counsel responded, "Not as to testimony." (*See* Ans. Exh. F at 200–01).[12]

After then citing California authority for the propositions (a) that only relevant evidence is admissible, and (b) that, while a trial court is vested with wide discretion in determining the relevance of evidence, it has no discretion to admit irrelevant evi-

dence, the Court of Appeal reasoned as follows (*see* Ans. Exh. F at 203–04):

Appellant does not dispute that the trial testimony of the 1992 ADW victim was sufficient to establish he was the one who used the knife during the attack.[13] Accordingly, it was appellant's burden to refute such evidence of his personal use of a dangerous and deadly weapon by showing that it was someone else, not he, who wielded that knife. Clearly, appellant knew what his defense was in that matter. If such defense primarily was that he was simply an aider and abettor, not the knife wielder, then it was incumbent on appellant to point this out and to identify what evidence was presented to support such defense. This he did not do. He therefore failed to show that any of the untranscribed portions of the 1992 oral trial was relevant.[14]

The Court concurs with the California Court of Appeal's reasoning and conclusion. There has been no showing by petitioner that the trial court excluded or prohibited any evidence probative or relevant to the issue of whether petitioner personally used a deadly weapon with respect to his 1992 ADW conviction. Thus, there was no due process violation.

The Court therefore finds and concludes that the California court's rejection of this claim neither was contrary to nor involved an unreasonable application of clearly es-

---

12. The record belies any contention by petitioner that the trial court excluded any evidence proffered by petitioner other than the untranscribed portions of the 1992 trial testimony. Indeed, the Court notes that, when petitioner raised this claim in his second direct appeal and in his ensuing Petition for Review to the California Supreme Court, he framed the claim solely in terms of the trial court's failure to review the entire transcript of the 1992 trial. (*See* Ans. Exh. E at 169, 177–84; Ans. Exh. G at 208, 213–15).

13. *During the trial, the victim positively identified appellant as the knife wielder, and his testimony established there was only one perpetrator.*

14. As also noted by the California Court of Appeal, the additional portion of the 1992 oral trial proceedings subsequently transcribed establish that petitioner did not rely on the defense that an accomplice, not he, wielded the knife. (*See* Ans. Exh. F at 204 n. 8; *see also* RT A–1 through A–137).

tablished federal law, as determined by the United States Supreme Court.

### D. *Petitioner is not entitled to habeas relief with respect to his claim that the trial court improperly assumed the prosecutor's duties.*

■ Petitioner contends that the trial court violated his right to due process when it assumed the prosecutor's duties to select and procure the evidence at the retrial of petitioner's 1992 conviction. (*See* Pet. at ¶ 10d; Trav. at 16–18).

■ On federal habeas review of a state trial judge's conduct, the issue is not the presence of judicial misconduct. Rather, the issue is whether, in the context of the trial as a whole, the judge's behavior rendered the trial so fundamentally unfair as to violate due process. *See Duckett v. Godinez,* 67 F.3d 734, 740–41 (9th Cir. 1995), *cert. denied,* 517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996). Although due process is presumed to be violated where there is actual bias or a factual basis for bias on the part of the judge (*see Vasquez v. Hillery,* 474 U.S. 254, 263, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)), the Court must otherwise presume the judge's honesty and integrity (*see Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

Here, in rejecting petitioner's claim, the California Court of Appeal reasoned that the trial court had not unilaterally conducted any investigation or procured any evidence which was detrimental to the defense, but rather had simply implemented its duty to ensure the orderly and timely proceedings of the rehearing. (*See* Ans. Exh. F at 196). The Court has no basis for disagreeing with the Court of Appeal's

reasoning or conclusion. Based on its own review of the record, the Court finds that the trial court's attempts to verify the reason the original court reporter failed to appear and its issuance of an order for an expedited transcript of the victim's testimony did not render the retrial so fundamentally unfair as to violate federal due process.

The Court therefore finds and concludes that the California courts' rejection of this claim neither was contrary to nor involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.

### E. *Petitioner is not entitled to habeas relief with respect to his Confrontation Clause claim.*

Petitioner contends that the trial court prohibited him from asking a detective questions about the existence of an arrest warrant for the victim, in violation of petitioner's Sixth and Fourteenth Amendment rights to confront witnesses. Petitioner claims that the questions were relevant "to show that the victim had a motivation to please law enforcement agents." (*See* Pet. at ¶ 10f; Trav. at 21–22).

#### 1. *the underlying proceedings*

The record reflects that petitioner called Los Angeles Police Department Detective Richard Ulley as a defense witness. Detective Ulley testified that no fingerprints were recovered from the broken glass; that he did not locate the woman who was walking home with the victim before the incident (according to the victim's testimony); that he did not locate any blood at the scene of the incident; that he did not locate the man who did not want to get involved (according to the victim's testimony); that he was not able to discover any other assaults in Los Angles County around the time of the incident (the victim

had testified that petitioner had told her he was going to do to her what he had done to another woman); and that he was not able to find any report about a stolen black purse to corroborate the victim's statements. (*See* 4 RT 1623–30).

During cross-examination, Detective Ulley testified that at the police station on November 1, 1999, he had conducted a one-and-a-half-hour follow-up interview of the victim. When the prosecutor began to ask Detective Ulley about the victim's statements at the interview, petitioner's counsel objected on hearsay grounds. The trial court overruled the objection. Petitioner's counsel then indicated he wanted to ask Detective Ulley about whether he knew on November 1 that there was a warrant for the victim's arrest and why he did not do anything about it. When the trial court asked the relevance of those questions, petitioner's counsel answered, "To show that they were giving her a favor, that they were allowing her to remain out." The trial court excluded such questions. (*See* 4 RT 1633–37). Detective Ulley then testified about the victim's statements at the follow-up interview. (*See* 4 RT 1637–48).

### 2. *analysis*

■■■■■ A primary interest secured by the Confrontation Clause of the Sixth Amendment is the right of an accused in a criminal prosecution to cross-examine witnesses against him or her. *See Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The Confrontation Clause of the Sixth Amendment "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106

S.Ct. 292, 88 L.Ed.2d 15 (1985)(emphasis in original). It does not deprive "trial judges ... [of] wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431. The Confrontation Clause is not violated by the exclusion of evidence when "the jury is otherwise in possession of sufficient information upon which to make a discriminating appraisal of the subject matter at issue. When the refused cross-examination relates to impeachment evidence, we look to see whether the jury had sufficient information to appraise the bias and motives of the witness." *Skinner v. Cardwell*, 564 F.2d 1381, 1388–89 (9th Cir.1977), *cert. denied*, 435 U.S. 1009, 98 S.Ct. 1883, 56 L.Ed.2d 392 (1978).

■■■■ Here, in rejecting petitioner's claim, the California Court of Appeal observed that it was not convinced that the evidence about the arrest warrant would have been helpful to the jury in assessing the victim's credibility. The Court noted that the victim "was not a 'snitch' hoping to trade inside information about a crime involving someone for lenient treatment. She was the victim and had been seriously injured. As such, she had no motivation to identify the wrong person or makeup [sic] a story about what happened for a reward." (*See* Ans. Exh. B at 109).

The Court concurs with the California Court of Appeal's reasoning and conclusion. The probative value of evidence of the existence of an arrest warrant for the victim at the time of the follow-up interview on November 1 was slight, at best. Immediately following the incident, the bloody and crying victim told three police officers about petitioner's robbery and assault. (*See* 4 RT 1504–07, 1524, 1562,

1564–67, 1571, 1597–1602, 1607–10, 1612–19). There was no indication that the victim's discussion of the incident with Detective Ulley during a follow-up interview was affected by the existence of an arrest warrant. *See Wood v. State of Alaska,* 957 F.2d 1544, 1550 (9th Cir.1992)(noting that a defendant does not have a constitutional right to present irrelevant evidence). Indeed, the defense did not ask the victim any questions about the arrest warrant during cross-examination. Moreover, the defense was afforded the opportunity at trial to cross-examine the victim regarding her possible bias and motive to lie. (*See* 3 RT 1267–1313). It therefore appears to the Court that the jury here had sufficient information to appraise the biases and motives of the victim, and otherwise to assess her credibility. *See Skinner, supra.*

Accordingly, the Court finds and concludes that the California courts' rejection of petitioner's Confrontation Clause claim neither was contrary to nor involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.

■ In any event, even assuming arguendo that the inability to cross-examine Detective Ulley about the existence of an arrest warrant for the victim at the time of the follow-up interview did amount to federal constitutional error as a matter of clearly established Supreme Court law, habeas relief still would not be warranted unless such error had a substantial and injurious effect or influence in determining the jury's verdict. *See Van Arsdall,* 475 U.S. at 681–84, 106 S.Ct. 1431. In *Van Arsdall,* the Supreme Court articulated a number of factors for a reviewing court to consider in its determination of whether Confrontation Clause error was harmless: "These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431.

Here, the victim's testimony was important to the prosecution's case. However, substantial other evidence was presented at trial implicating petitioner and corroborating the victim's testimony on material points, including the police officers' testimony concerning the victim's condition, the victim's statements immediately following the incident, the victim's identification of petitioner, and the items recovered from petitioner (i.e., a female's black purse holding a white plastic bag with what appeared to be blood) (*see* 4 RT 1504–07, 1524–28, 1530, 1562, 1564–67, 1571, 1597–1602, 1607–10, 1612–19); Detective Ulley's testimony concerning the victim's statements at the follow-up interview and the victim's testimony at the preliminary hearing (*see* 4 RT 1637–50, 1808–09); and a criminalist's testimony that blood found on petitioner's shirt was consistent with petitioner's and the victim's bloodtypes. (*See* 4 RT 1834–40, 1847). In addition, the defense had the opportunity to impeach the victim's testimony during cross-examination. Further, as noted by the California Court of Appeal, the primary difference between the story the victim told the officers on the night of the attack and the version of the events told to Detective Ulley was the accusation that petitioner had forced her to walk down an alleyway or walkway in order to sexually assault her; and the jury did not convict on the assault with intent to commit rape or kidnapping with intent to commit rape charges. (*See* Ans. Ex. B at 109). Based on its own independent review of the record, the Court therefore finds and

**1148**

concludes that the exclusion of the evidence about the existence of an arrest warrant for the victim did not have a substantial and injurious effect or influence in determining the jury's verdict.

Accordingly, the Court finds and concludes that the California courts' rejection of petitioner's Confrontation Clause claim neither was contrary to nor involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.

**F. *Petitioner is not entitled to habeas relief with respect to his instructional error claim.***

█ Petitioner contends that the trial court instructed the jury with CALJIC No. 17.41.1,[15] in violation of petitioner's Sixth and Fourteenth Amendment rights. According to petitioner, the instruction chilled the jury's deliberative process and violated petitioner's rights both to a unanimous jury and to the independent decision of each juror. (*See* Pet. at 10e; Trav. at 18–20).

█ To merit relief when an allegedly erroneous jury instruction is given, petitioner must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154–55, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977); *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir.1988). The challenged instruction must be considered in the context of the trial record and the instructions

as a whole. *Estelle, supra; see also Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Even where an instruction was given in violation of a defendant's federal constitutional right to due process, habeas relief is not warranted unless the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht, supra.*

Subsequent to petitioner's trial herein, in *People v. Engelman*, 28 Cal.4th 436, 440–41, 49 P.3d 209, 121 Cal.Rptr.2d 862 (2002), the California Supreme Court directed state trial courts not to give CALJIC No. 17.41.1 in the future based on a concern that the instruction "has the potential to intrude unnecessarily on the deliberative process and affect it adversely-both with respect to the freedom of jurors to express their differing views during deliberations, and the proper receptivity they should accord the views of their fellow jurors." *See* 28 Cal.4th at 440, 449, 121 Cal.Rptr.2d 862, 49 P.3d 209. However, the California Supreme Court held that the instruction did not violate a defendant's federal or state constitutional right to trial by jury or his state right to a unanimous verdict. *See* 28 Cal.4th at 444, 121 Cal.Rptr.2d 862, 49 P.3d 209.

The Court notes that petitioner has failed to cite, and the Court has been unable to locate, any federal authority (let alone United States Supreme Court authority) which holds that CALJIC No. 17.41.1 (or an instruction like it) violates a defendant's federal constitutional right to due process. The Court therefore has no

---

**15.** The trial court instructed the jury with CALJIC No. 17.41.1 (1998 New) ("Juror Misconduct") as follows:

"Now, the integrity of the trial requires that jurors at all times during their deliberations conduct themselves as required by these instructions. Accordingly, should it

occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of that situation." (*See* 1 CT 178; 5 RT 2148–49).

basis for finding or concluding that the California courts' rejection of this claim either was contrary to or involved an unreasonable application of clearly established Supreme Court law.

 Moreover, even assuming arguendo that CALJIC No. 17.41.1 did violate petitioner's federal constitutional right to due process *as a matter of clearly established Supreme Court law*, the Court has no basis for finding or concluding that the giving of the instruction had a substantial and injurious effect or influence in determining the jury's verdict. Considered as a whole, the instructions given to the jury accurately stated the law and advised the jurors that it was their duty to decide the case based on their individual opinions.[16] The jurors reached a verdict after deliberating for less than 5 hours (*see* 1 CT 91, 115–16, 193; 5 RT 2154–56, 2432–36), and there is no indication in the record that any problems even arguably attributable to the giving of CALJIC No. 17.41.1 occurred during deliberations (e.g., jury deadlock on the four counts on which the jury reached a verdict, conflict regarding holdout jurors, refusal to follow the law, stifled deliberations, or intrusion by the trial judge into the deliberative process). Indeed, as noted by the Court of Appeal, the fact that a minority of jurors did not permit a verdict to be reached on two charges also evidenced that the giving of the instruction did not have "any untoward effect on the jurors" and that the jurors did not feel "constrained from expressing unpopular views during deliberations." (*See* Ans. Exh. B at 112–13).

## RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

---

16. The Court notes in this regard that the jurors were instructed *inter alia* that they must accept and follow the law as the judge stated it to them, regardless of whether they agreed with the law (*see* 1 CT 119; 4 RT 1856); that the defendant was presumed to be innocent, and the People had the burden of proving the defendant guilty beyond a reasonable doubt (*see* 1 CT 142; 4 RT 1869); that the People and the defendant were entitled to the individual opinion of each juror, and they should not decide any question in a particular way because a majority of the jurors, or any of them, favored that decision (*see* 1 CT 176: 4 RT 2147–48); and that, in order to reach a verdict, all twelve jurors had to agree to the decision (*see* 1 CT 183; 5 RT 2151).